UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDER CHRISTOF GRIMALDI,<br><br>Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, acting<br>Commissioner of Social Security,<br><br>Defendant. | No. 1:22-cv-00316-GSA<br><br>**OPINION & ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF**<br><br>**(Doc. 17)** |

### I.   Introduction

Plaintiff Alexander Christof Grimaldi ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for supplemental security income pursuant to Title XVI of the Social Security Act. The matter is before the Court on the parties' briefs which were submitted without oral argument to the United States Magistrate Judge.[1]  Docs. 17–18.  After reviewing the record the Court finds that substantial evidence and applicable law support the ALJ's decision.  Plaintiff's appeal is therefore denied.

### II.   Factual and Procedural Background[2]

On November 27, 2018 Plaintiff applied for supplemental security income. The application was denied initially on May 16, 2019 and on reconsideration on July 11, 2019. Plaintiff requested a hearing which was held before an Administrative Law Judge (the "ALJ") on March 4, 2021. AR 41–63. On April 6, 2021 the ALJ issued a decision denying Plaintiff's application. AR 22–40. The Appeals Council denied review on October 7, 2021. AR 1–6. On March 18, 2022 Plaintiff filed a complaint in this Court.

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge. *See* Docs. 8 and 11.

[2] The Court has reviewed the relevant portions of the administrative record including the medical, opinion and testimonial evidence about which the parties are well informed, which will not be exhaustively summarized. Relevant portions will be referenced in the course of the analysis below when relevant to the parties' arguments.

### III. The Disability Standard

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted). If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate non-disability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the

claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f). While the Plaintiff bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience. *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

**IV.     The ALJ's Decision**

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since his application date of November 27, 2018. AR 27. At step two the ALJ found that Plaintiff had the following severe impairments: symptomatic human immunodeficiency virus (HIV) infection, post-traumatic stress disorder (PTSD), bipolar disorder, and anorexia. AR 27. At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 27–29.

Prior to step four the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. 416.967(c) except that he could: occasionally climb ladders, ropes or scaffolds; occasionally operate moving machinery; occasionally work at unprotected heights; "perform simple, routine and repetitive tasks in a work environment free of fast pace production requirements;" "work in a low stress job defined as end of the day type work;" and occasionally interact with the public. AR 29–34.

At step four the ALJ found that Plaintiff had no past relevant work. AR 34. At step five, in reliance on the VE's testimony, the ALJ found that Plaintiff could perform jobs existing in significant numbers in the national economy, namely: dining room attendant; linen attendant; and

cleaner.  AR 34–35.  Accordingly, the ALJ found that Plaintiff was not disabled at any time since his application date of November 27, 2018.  AR 35.

### V.     Issues Presented

Plaintiff asserts two claims of error: 1) that the ALJ failed to offer specific, clear, and convincing reasons for rejecting Plaintiff's testimony; and 2) that the ALJ erred in his evaluation of Dr. Shankerman's opinion.

#### A.     Plaintiff's Testimony

##### 1.     Applicable Law

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity.  *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner.  *See* 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC).  "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity."  *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995).

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883.  *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical

and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). The RFC need not mirror a particular opinion; it is an assessment formulated by the ALJ based on all relevant evidence. *See* 20 C.F.R. §§ 404.1545(a)(3).

The ALJ is responsible for determining credibility,[3] resolving conflicts in medical testimony and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p.

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen*, 80 F.3d at 1281; S.S.R 16-3p at 3. First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281–82. If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." S.S.R. 16-3p at 2.

An ALJ's evaluation of a claimant's testimony must be supported by specific, clear and convincing reasons. *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014); *see also* S.S.R. 16-3p at *10. Subjective testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but the medical evidence "is still a relevant factor in determining

---

[3] Social Security Ruling 16-3p applies to disability applications heard by the agency on or after March 28, 2016. Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities." S.S.R. 16-3p at 1-2.

5

the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).

The ALJ must examine the record as a whole, including objective medical evidence; the claimant's representations of the intensity, persistence and limiting effects of his symptoms; statements and other information from medical providers and other third parties; and any other relevant evidence included in the individual's administrative record. S.S.R. 16-3p at 5.

### 2. **Analysis**

The ALJ found that Plaintiff suffered severe impairments that could reasonably be expected to cause pain and other symptoms, but found inadequate support for the notion that the intensity, persistence, and limiting effects of Plaintiff's pain and other symptoms were disabling. Plaintiff disputes the accuracy and completeness of all of the ALJ's associated reasoning, including as it relates to: 1) consistency with the objective medical record; 2) his activities of daily living; and 3) his purportedly sporadic and conservative treatment.

#### a. **Objective Medical Record**

First, Plaintiff disputes the ALJ's finding that "the record shows the claimant generally denied fatigue and headaches as well as psychiatric symptoms" and "physical examination were largely unremarkable with the exception of occasionally reduced range of motion, tenderness, or muscle spasm." AR 33 (citing 505–06, 527, 691, 696, 711). Plaintiff does not dispute whether the ALJ's citations support the propositions for which they were cited. Rather, Plaintiff cites records which he contends the ALJ ignored, and which he contends support the opposite proposition-- namely that he did "repeatedly report fatigue, headaches, and psychiatric symptoms, along with other significant symptoms of HIV infection and/or side effects from HIV medications." Br. at 29, Doc. 17.

Plaintiff cites ER visits dated November 11, 2018 and December 18, 2018 for headaches

with visual disturbances, weakness, fatigue, and nausea (AR 359, 447), and a February 11, 2019 office visit with Dr. Shankerman noting worsening headaches with visual disturbances, cold symptoms and knee pain (AR 502, 504). However, the ALJ did not ignore this evidence as he cited and described all three examinations, albeit more so in relation to Plaintiff's HIV medication regimen:

> On November 11, 2018, the claimant reported to the emergency department for a headache. At that time, he reported that he was taken off HIV therapy in March of that year when he developed pancreatitis. He reported that he never restarted medication. His last recorded CD4 was 690 in September of 2015 (3F/6). His CD4 at the time of the emergency department visit was 688 (3F/11). He returned to the emergency department with headache, visual disturbance, nausea, and dizziness on December 28, 2018. The claimant was still not taking medication for his HIV (5F/9). The record shows that the claimant was prescribed new HIV medication in February of 2019. That month, he reported headaches and visual loss, but no other physical symptoms. An examination was unremarkable. His doctor referred him too an ophthalmologist (6F/1-5).

AR 31.

Though perhaps not exemplary of the ALJ's assertion that Plaintiff "generally denied" headaches, the February 11, 2019 progress note does state under history of present illness that "chronic headaches are tension headaches that go away quickly," which somewhat undermines Plaintiff's testimony that they last one to two days. AR 504; 48-49.

With respect to Plaintiff's fatigue, although the record may not entirely substantiate the ALJ's assertion that Plaintiff generally denied the same, the record at a minimum reveals mixed reports on that topic and Plaintiff's citation to a few counterexamples does not establish reversable error. *See, e.g.*, 359 ("Negative for fatigue and fever"); 374 ("pertinent negatives include . . . fatigue, fever headache, insomnia . . ."); 376 (negative for fatigue); 386 (same); 388; 411; 657; 662; 677 ("Constitutional: negative fatigue"); 682 (same); 690 (same); 695 (same); *but see* 670 ("C/O fatigue"); 671 (assessed with fatigue); 686 ("Last week, he was very sick. He had fever, chills, back pain, body aches, fatigue, and a sore throat.").

Plaintiff goes on to cite several treatment records and ER records from March 4 2019 (AR 524, 719), December 4, 2019 (AR 618), March 11, 2020 (AR 690), and April 8, 2020 (AR 686) noting various cold symptoms, flu like symptoms, and medication side effects including ear pain, sore throat, inflamed eyes, diffuse body aches, fever, chills, nausea, and insomnia. AR 524, 719. The ALJ acknowledged the majority of these findings even if the ALJ did not pin cite each one. *See* AR 31 ("He was treated for cold symptoms and throat infections on several occasions. He occasionally complained of muscle pain in his back and neck . . . In March of 2020, the claimant reported he was not taking his medication due to nausea and insomnia (14F/38).").

As Plaintiff emphasizes, the Commissioner's own Listing 14.00 (G)(5) notes the varied and extensive side effects of antiretroviral drugs (such as the cold and flu like symptoms he describes from the treatment records) which can often be indistinguishable from symptoms of the underlying HIV infection itself.

At the same time however, Plaintiff's factual discussion is somewhat afield from the symptoms he identified at the hearing as the impediments to his ability to work, namely extreme fatigue and exhaustion, as well as headaches he's suffered from since the third grade that come on every day or two and last one to two days. AR 48-49. The ALJ understandably focused more so on the fatigue, headaches and the mixed evidence concerning the same, focusing less so on the complaints in the record concerning diffuse body aches, nausea, fever, chills and other cold and flu like symptoms.

From a musculoskeletal standpoint, Plaintiff emphasizes chiropractic treatment records from April through July 2019 noting neck, shoulder, and back pain, reduced range of motion, tenderness, and muscle spasms. (AR 529, 531-532, 533-536, 537-540, 701-704). Further to the point, Listing 14.00 (G)(5) substantiates that muscle and joint pain are side effects of antiretroviral drugs and symptoms of HIV itself. The ALJ did not refute that. The ALJ acknowledged Plaintiff's

complaints of muscle and neck pain but found "physical examination [sic] were largely unremarkable with the exception of occasionally reduced range of motion, tenderness, or muscle spasm." AR 33 (citing (6F/4-5; 9F/5; 14F/39; 14F/44; 14F/59; AR 505–06, 527, 691, 696, 711).

Granted, the ALJ's string citation to illustrate multiple competing propositions detracts somewhat from the clarity of the ALJ's point.  Further, the ALJ did not pin cite or describe each of the chiropractic records. However the ALJ did cite representative examples such as a June 26, 2019 chiropractic visit with DC Khallman noting neck pain, tenderness, reduced ROM, increased cervicodorsal myospasm, and assessing diagnoses of cervical and thoracic segmental dysfunction, which the ALJ cited as Ex. 14F/59 (AR 711).  This chiropractic examination echoes the same findings as the records cited by Plaintiff, such as the July 26, 2019 chiropractic visit with DC Jeanette Harris (AR 701-704).  Thus contrary to Plaintiff's contention, the ALJ did not ignore the probative evidence of musculoskeletal dysfunction as reflected in Plaintiff's chiropractic records.

The ALJ noted that on other occasions Plaintiff's musculoskeletal exam was unremarkable. *See, e.g.,* AR 505 ("Musculoskeletal: Motor Strength and Tone: normal and normal tone. Joints, Bones, and Muscles: no contractures, malalignment, tenderness, or bony abnormalities and normal movement of ell extremities. Extremities: no cyanosis, edema, varicosities, or palpable cord."); 527 (same).  Defendant also cites additional examples of unremarkable musculoskeletal findings as to range of motion and tenderness.  Resp. at 4 (citing AR 360, 451, 469, 490).  Plaintiff does not acknowledge or dispute the ALJ's or Defendant's citations.

The cited unremarkable musculoskeletal examinations were in the primary care or emergency care context.  One could argue the chiropractic treatment records are more probative of musculoskeletal dysfunction than other records such as primary care or emergency department visits, particularly where some of the latter visits were to address complaints other than musculoskeletal dysfunction (such as headaches, visual disturbances, HIV medication regimen).

9

But the impetus was on Plaintiff to explain why his view of the record, not the ALJ's, must control. Simply citing a few counterexamples is insufficient. *See Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (noting that if the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision).

As to Plaintiff's mental health, Plaintiff emphasizes two psychiatric examinations dated October 2020 and December 2020 noting he reported depression, insomnia, restlessness, decreased appetite, difficulty concentrating, increased aggression, irritability, needing to force himself to eat once a day, and anxiousness. AR 639, 648. The ALJ cited and discussed these two evaluations from Turning Point Selma, along with Plaintiff's reported symptoms at those visits. AR 31. Notwithstanding, the ALJ noted that his appearance, orientation, memory, judgment, insight, and thought content were all within normal limits in October 2020, similarly so in December 2020, and similarly so at other examinations outside the mental health context. The ALJ noted that the record reflects no further treatment from Turning Point or any other mental healthcare provider outside of those two examinations. *Id.* (citing 3F/7; 5F/10; 6F/4; 11F/43; 12F/4; 13F/5; 14F/67).

The ALJ also discussed the findings and opinion of the psychiatric consultant, Dr. Portnoff (PhD), who examined Plaintiff in March 2019, noting similar findings within normal limits as discussed above, diagnosed bipolar II, PTSD and anorexia, and opined that Plaintiff has: no limitations in his ability to perform detailed and complex tasks, accept instructions from supervisors, work on a consistent basis without special or additional instruction due to psychiatric problems, and maintain regular attendance in the workplace; mild to moderate limitations in his ability to interact with coworkers and the public, complete a normal workday or workweek without interruptions from a psychiatric condition, and deal with the stress encountered in a competitive work environment. AR 32 (citing Ex. 8F, AR 516–21).

The ALJ did not find the opinion entirely persuasive, but nevertheless found it was supported by Dr. Portnoff's examination and the broader medical record. The ALJ assessed related restrictions in the RFC, including a restriction to simple, routine and repetitive tasks with occasional public interaction in a low stress work environment free from fast-paced production requirements. Plaintiff does not offer any suggestion as to what additional or different mental RFC restrictions the ALJ ought to have incorporated even if the ALJ was inclined to credit Plaintiff's testimony concerning his psychiatric symptoms. For that reason Plaintiff's argument falls short. *See Juniel v. Saul*, No. 1:20-CV-0421 JLT, 2021 WL 2349878, at *7 (E.D. Cal. June 9, 2021) ("Plaintiff fails to show this limitation to which he testified—and the ALJ acknowledged remained in the treatment records—was not properly accounted for in his residual functional capacity, which indicated Plaintiff "could not have public contact" and limited interaction with co-workers.").

Finally, Plaintiff emphasizes the third party function report his father completed which he contends corroborated his allegations insofar as his father stated he is extremely fatigued, "usually sleeps all day," "complains of headaches," is "usually in bed asleep and sick," "forgets things in the middle of doing them," can pay attention for "a few minutes," and "goes into a verbal rage out of nowhere." AR 273, 276, 278. Plaintiff identifies this third party function report as another example of the ALJ's failure to discuss evidence which directly contradicts the ALJ's findings that Plaintiff "generally denied fatigue and headaches as well as psychiatric symptoms" and had "unremarkable" physical examinations during the disability period.

Importantly, the ALJ did discuss this third party function report, though not all the statements Plaintiff emphasizes. The third party function report does not directly contradict the ALJ's findings which related to Plaintiff's lack of consistent complaints to his clinicians. The father's report being an independent piece of evidence which does corroborate Plaintiff's account may well have might have tipped the scales the other way. But that report has little to do with what

11

the objective medical record documented as to what Plaintiff reported to his clinicians and what they observed. His father's third party report does not contradict the ALJ's findings in those respects.

Further, as to his alleged memory and concentration difficulties, prior to the RFC analysis the ALJ provided pertinent discussion in performing the psychiatric review technique at step three. The ALJ acknowledged at least one instance of reduced concentration but noted he was often alert, oriented, and able to maintain concentration upon examination. AR 29 (citing 3F/7; 5F/10; 6F/4; 12F/4; 13F/5; 14F/67).

As to memory, the ALJ noted Plaintiff's own function report which indicated his conditions affected his memory but not his ability to understand and follow instructions. AR 28 (citing Ex. 5E). The ALJ also noted he was able to recall four of four words at the consultative examination (Ex. 8F/5), and often demonstrated appropriate judgment, insight, and memory at other examinations. *Id.* (citing 6F/4; 8F/5; 9F/5; 13F/5; 14F/67). Notwithstanding, the ALJ found mild to moderate limitations in both areas (understand/remembering/applying information, and maintaining concentration/persistence and pace), and included related restrictions in the RFC limiting Plaintiff to simple, routine, and repetitive work in low stress environments without fast paced production standards. Plaintiff offers explanation as to how else the ALJ ought to have translated his mental limitations in the RFC, even if the ALJ was inclined to credit Plaintiff's fathers third party function report.

Thus, Plaintiff establishes no error with respect to the ALJ's treatment of the objective medical record, formulation of the RFC, and rejection of Plaintiff's testimony about disabling fatigue, headaches, musculoskeletal pain, and psychiatric symptoms.

### b.  **Activities of Daily Living**

Plaintiff also disputes the ALJ's finding that his activities of daily living undermined his

subjective testimony. The hearing testimony and function report statements the ALJ found not to be entirely credible included: difficulty with lifting, squatting, bending, walking, climbing stairs, seeing, memory, concentration, extreme fatigue, inability to lift more than 15 pounds, frequent night sweats, headaches, and twice monthly panic attacks. AR 30.

As to the activities purportedly undermining that testimony, the ALJ noted Plaintiff reported no difficulty with personal care activities, could do laundry, ironing, sweeping, vacuuming, clean the bathroom, make sandwiches and frozen dinners, go out alone, drive, grocery shop in stores (albeit with difficulty due to his anxiety), and use a computer. AR 30.

"The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits," and "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989).

An ALJ can rely on a claimant's daily activities as a basis for discrediting a claimant's testimony if (1) the daily activities contradict the claimant's other testimony; or (2) "a claimant is able to spend a substantial part of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

Plaintiff contends the cited activities do not meet the second basis identified in the *Orn* case because Plaintiff did not spend a substantial part of his day performing the activities, nor are the activities transferable to a work setting. Rather, he contends the function reports completed by him and his father noted that due to fatigue he makes only one meal per day (sandwich or frozen food), spends no more than 15 to 45 minutes doing chores, requires assistance, only does so when encouraged to, shops only twice a month, and is otherwise in bed sick. Br. at 33 (citing AR 510–11; 275–76). That encapsulation is largely accurate with one or two exceptions. While his father

stated he "sleeps all day" and is "usually in bed asleep and sick," (AR 274, 276) Plaintiff indicated he takes 2 naps per day of 1 hour each (AR 510) which leaves many additional hours unaccounted for during which it's not clear what he is engaged in. The two statements could be logically squared if he were simply lying in bed most of the day but not necessarily asleep. In any event, the cited activities are not transferable to a work setting.

As to the first basis identified in *Orn* ("the daily activities contradict the claimant's other testimony") Plaintiff simply contends the ALJ failed to make the requisite findings which Plaintiff contends must be specific. Some precedent suggests the contradiction must be fairly direct, and the ALJ must engage in a matching exercise and explain, "which daily activities conflicted with which part of Claimant's testimony." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014). Other precedent suggests the contradiction need not be as direct and no matching exercise is required. *See Valentine v. Commissioner Social Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009) (finding the ALJ satisfied the "clear and convincing" standard for an adverse credibility determination where claimant engaged in "gardening and community activities . . . evidence [which] did not suggest Valentine could return to his old job," but "did suggest that Valentine's later claims about the severity of his limitations were exaggerated.").

Notwithstanding, the activities cited by the ALJ (with the added context plaintiff emphasizes from the function reports) do not point to an active individual, and his testimony and function reports were reasonably consistent. Plaintiff's activities of daily living were not a clear and convincing reason to discount his testimony about, among other things, his extreme and debilitating fatigue. But the objective medical record discussed above and sporadic treatment as discussed below were sufficient reasons for the ALJ to rely on.

### c. "Conservative" and "Sporadic" Treatment

Plaintiff disputes the ALJ's finding that his treatment was conservative and sporadic. "[E]vidence of conservative treatment is sufficient to discount a claimant's testimony regarding the severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 750-751 (9th Cir. 2007). The ALJ identified no examples of more aggressive HIV treatment options available to Plaintiff, nor does the record reveal any. As such, this was not a persuasive basis to discredit Plaintiff's testimony.

The ALJ also noted "He has attended office visits for his HIV sporadically, with the record showing that his compliance was suboptimal." AR 33. Further to the point, the ALJ noted that at a November 11, 2018 ER visit Plaintiff reported that he was taken off HIV therapy in March of that year when he developed pancreatitis and reported that he never restarted medication. The ALJ further noted that "The record shows that the claimant was prescribed new HIV medication in February of 2019." AR 31 (citing Ex. 6F/1-5). The ALJ further noted as follows:

> The record shows the claimant continued to struggle with medication compliance (14F/13). He was treated for cold symptoms and throat infections on several occasions. He occasionally complained of muscle pain in his back and neck, but generally denied headaches, fatigue, or visual disturbances (6F; 9F; 14F). In December of 2019, the claimant's doctor spoke to him about his failure to follow up on a routine basis. The claimant reported he gives little thought to his HIV infection unless he is planning to go on a date (14F/43). In March of 2020, the claimant reported he was not taking his medication due to nausea and insomnia (14F/38).

The cited records do support the ALJ's finding that his compliance was suboptimal. *See* AR 665 ("will consider switching to single tablet regimen to improve compliance."); 695. In evaluating a claimant's credibility, an ALJ may consider an "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *See, Chaudry v. Astrue*, 688 F.3d 661, 672 (9th Cir. 2012).

Plaintiff contends, however, that the ALJ was unjustified in drawing inferences from his medication non-compliance because he had a good explanation for non-compliance, namely side effects including gastrointestinal upset, nausea, insomnia, and acute pancreatitis requiring

15

hospitalization. Plaintiff further explains that "the Agency itself recognizes that "drug holiday[s]" – during which a claimant with HIV has been advised by their physician to stop taking their medications – "does not imply that [a claimant's] medical condition has improved; nor does it imply that [the claimant is] noncompliant with treatment". Listing 14.00 (G)(5)(b).

However, a full quotation from the December 12, 2019 examination (as cited by the ALJ) is more illustrative of this point:

> The patient presents for follow-up of HIV infection. However the chief complaint today is recurrent throat infections. The patient reports several episodes of tonsillitis over the last year, The patient self-medicated with penicillin obtained from a friend. The patient's request, today, is that we refer him to a surgeon for consideration of tonsillectomy.
> We had a long discussion about the patient's HIV infection, and his failure to follow-up on a routine basis, The patient states that he gives little thought to his HIV infection, unless he is planning to go out on the date.
> Another factor in his failure to follow-up, and engage in routine office visits, is a previous diagnosis of pancreatitis; thought to be secondary to 1 of his HIV medications. The patient relates that at the time of his pancreatitis, he was taking Triumeq. We reviewed the medications contained in Triumeq: Those being dolutegravir abacavir and lamivudine. We discussed using a regimen that contained none of those medications. He had previously taken Genvoya, Which is a four drug combination, with cobicistat as a booster. We discussed using a three drug regimen: biktarvy.

AR 695.

Importantly, there can be no legitimate dispute that Plaintiff suffered because of his HIV and likely thought about it constantly. However, the record nevertheless does establish non-compliance.

As to the medications thought to have caused his acute pancreatitis, the clinician discussed a different medication regimen, namely biktarvy. Thus, fear of pancreatitis was likely not a valid reason to avoid taking his medication. As the ALJ noted, as of March 2020 (3 months later), he was not taking biktarvy due to nausea and insomnia. AR 690. It is understandable that Plaintiff did not want to suffer nausea and insomnia, and it is unenviable that his only alternative was to risk opportunistic infections such as tonsillitis. Nevertheless, this was his providers treatment

recommendation. Further, as quoted above, the non-compliance noted by his provider was not just as to medication, but also as to his failure to follow up and engage in routine office visits. Finally, as to the HIV drug holiday Plaintiff references from Listing 14.00 (G)(5)(b), the point is inapplicable here because there is no indication his physician advised him to take a drug holiday. The ALJ did not err in relying on Plaintiff's sporadic treatment and non-compliance as a basis to discredit his testimony about the disabling severity of his fatigue and other symptoms.

### B.  Dr. Shankerman's Opinion

#### 1.  Applicable Law

For applications filed on or after March 27, 2017, the new regulations eliminate a hierarchy of medical opinions, and provide that "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, when evaluating any medical opinion, the regulations provide that the ALJ will consider the factors of supportability, consistency, treatment relationship, specialization, and other factors. 20 C.F.R. § 404.1520c(c). Supportability and consistency are the two most important factors and the agency will articulate how the factors of supportability and consistency are considered. *Id.*

On April 22, 2022, the Ninth Circuit addressed whether the specific and legitimate reasoning standard is consistent with the revised regulations, stating as follows:

> The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant. See 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) ..., including those from your medical sources."). Our requirement that ALJs provide "specific and legitimate reasons" for rejecting a treating or examining doctor's opinion, which stems from the special weight given to such opinions, see Murray, 722 F.2d at 501–02, is likewise incompatible with the revised regulations. Insisting that ALJs provide a more robust explanation when discrediting evidence from certain sources necessarily favors the evidence from those sources—contrary to the revised regulations.

*Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022)

### 2. **Analysis**

On February 11, 2019, Plaintiff's primary care physician Dr. Shankerman completed a questionnaire opining that Plaintiff could stand and walk less than two hours a day, sit without limitation, occasionally lift/carry 10 pounds, and frequently lift/carry less than 10 pounds. AR 514–15. The ALJ acknowledged that, as the claimant's treating physician, Dr. Shankerman has a longitudinal understanding of the claimant's impairments, symptoms, and limitations. AR 33. The ALJ nevertheless rejected the opinion because: 1) it "was offered in a brief form and does not contain sufficient explanation or reference to medical records to support the assessed limitations;" and 2) it was inconsistent with the record which demonstrated infrequent treatment, lack of specialized care, general denial of fatigue and other symptoms, and largely unremarkable physical examinations.

Plaintiff disputes the first reason, quoting *Garrison* in which the Ninth Circuit noted that a check-box form does not exist in a vacuum and is not per se unpersuasive. Br. at 38 (quoting *Garrison*, 759 F. 3d at 1013 (finding the ALJ erred in failing to recognize "the opinions expressed in check-box form…were based on significant experience with [the claimant] and supported by numerous records, and were therefore entitled to weight that an otherwise unsupported and unexplained check box form would not merit."]. Plaintiff understandably takes issue with the ALJ's all too common practice of criticizing the form and content of the agency's own pre-printed questionnaires. Nevertheless, this particular check-box questionnaire does provide space for the physician to "Please describe the objective findings which support the limitations indicated above." AR 515. Granted, the space provided is only about 25% of a page, but there was ample room for the physician to provide more detail than "Patient visibly [illegible] + appears chronically ill."

Second, the ALJ reiterated the same reasoning offered for discounting Plaintiff's own

testimony as discussed above. Accordingly, Plaintiff reincorporates the same argument and cites the same records in support. As discussed above, it was perhaps an overstatement for the ALJ to suggest Plaintiff "generally denied" fatigue and headaches, or that he had unremarkable musculoskeletal examinations (which was not true of the chiropractic records).

The record at a minimum contained mixed findings on these subjects. *See, e.g.*, AR 359 ("Negative for fatigue and fever"); 374 ("pertinent negatives include . . . fatigue, fever headache, insomnia . . ."); AR 504 ("chronic headaches are tension headaches that go away quickly"); AR 505 ("Musculoskeletal: Motor Strength and Tone: normal and normal tone. Joints, Bones, and Muscles: no contractures, malalignment, tenderness, or bony abnormalities and normal movement of all extremities. Extremities: no cyanosis, edema, varicosities, or palpable cord."); 527 (same).

Plaintiff's counterexamples do not establish that his view of the record must control over the ALJ's because both views had a reasonable basis in the record and thus affirmance is appropriate. *See Jamerson*, 112 F.3d at 1066. The ALJ's reasoning for rejecting Dr. Shankerman's opinion was also buttressed by Plaintiff's sporadic treatment, non-compliance with follow up appointments and medication, and lack of specialized care. AR 33. The ALJ committed no error in rejecting Dr. Shankerman's opinion that Plaintiff was limited to sedentary exertional work.

**VI.      Order**

For the reasons stated above, the Court finds that substantial evidence and applicable law support the ALJ's conclusion that Plaintiff was not disabled. Accordingly, Plaintiff's appeal from the administrative decision of the Commissioner of Social Security is denied. The Clerk of Court is directed to enter judgment in favor of Defendant Kilolo Kijakazi, acting Commissioner of Social Security, and against Plaintiff Alexander Christof Grimaldi.

IT IS SO ORDERED.

Dated: **July 21, 2023**         **/s/ Gary S. Austin**
                                  UNITED STATES MAGISTRATE JUDGE